In re PLANKINTON BLDG. CO.

HARVEY et al. v. GROSSMAN et al.
(two cases).

PLANKINTON BLDG. CO. v. GROSSMAN
et al.

Nos. 8422, 8423, 8515, 8598, 8599, 8558, 8595.

Circuit Court of Appeals, Seventh Circuit.
March 20, 1945.

Rehearing Denied April 17, 1945.

See also 138 F.2d 221.

Morris Berick, of Cleveland, Ohio, for appellants Albert J. Harvey, Jr., and Richard D. Harvey.

Carroll J. Lord and Norman L. Olson, both of Chicago, Ill., for appellant Albert J. Harvey.

Walter A. John, of Milwaukee, Wis., for appellant Plankinton Bldg. Co.

Raymond T. Zillmer, John M. Redford, L. J. Burlingame, H. T. Foulkes, and Bernard V. Brady, all of Milwaukee, Wis., Colby Stilson, of New York City (Olwell & Brady, of Milwaukee, Wis., and Breed, Abbott & Morgan, of New York City, of counsel), Thomas B. Hart and Arthur E. Boroughf, both of Chicago, Ill., and Herbert C. Hirschboeck and Victor M. Harding, Jr., both of Milwaukee, Wis., for appellees.

Maxwell Herriott, of Milwaukee, Wis., amicus curiae.

Before SPARKS and KERNER, Circuit Judges, and BRIGGLE, District Judge.

SPARKS, Circuit Judge.

These appeals are from the proceedings for the reorganization of Plankinton Building Company, under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., in which the court approved, confirmed, and directed to be consummated a plan of reorganization, which was consummated on April 5, 1944.

The appeals were consolidated for hearing. The substance of the orders appealed from and their respective dates are as follows:

1. Order of May 26, 1943, fixing the value of nonproductive assets of the debtor at $117,334.40, as of January 31, 1943.

2. Order of May 26, 1943, finding the debtor to be insolvent, and bringing current the value of the productive assets and liabilities.

3. Order of January 31, 1944, finding debtor insolvent, determining all facts requisite to confirmation, and confirming the plan of reorganization.

4. Order of April 1, 1944, implementing consummation of the plan of reorganization.

5. Order of April 3, 1944, further implementing the plan of reorganization.

Albert J. Harvey, a common stockholder, appealed from order No. 3.

Albert J. Harvey, Jr., and Richard D. Harvey, preferred stockholders, appealed from each of the above orders.

Order No. 3 was also appealed from in the name of the debtor, by its attorney.

Debtor is a Wisconsin corporation whose chief asset is a leasehold estate of a parcel of real estate owned by Plankinton Trust, leased to debtor's predecessor, Plankinton Building Properties, Inc., under a 99 year lease, with the option of successive renewals, and located in the principal retail district of Milwaukee. Debtor's entire business has been the operation of the store and office building erected by its predecessor on the leased site.

The building consists of seven stories and a basement. The basement, first and second floors, built in 1916, are used for retail stores; the remaining stories, built in 1926, are used for business and office space. The Harvey family promoted the venture, owned the equity stock, and managed the building from its erection until debtor's predecessor was reorganized under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. That reorganization proceeding was instituted on September 7, 1934, upon the voluntary petition of that debtor, disclosing that it was unable to meet its accruing obligations. At that time there was pending in the state court a foreclosure of the leasehold mortgage, and there was a substantial default in the rent owed to Plankinton Trust under the ground lease.

A plan of reorganization was approved by the Master and was accepted by the requisite number of each class affected, and it was confirmed by District Judge Geiger, since deceased, on July 1, 1936. The value of the building and leasehold on July 24, 1936, was reported by the Master to be $2,368,820. In that report he further stated

that the plan had been fully consummated except as to determination of fees, allowances and reorganization expenses, which matters were then being heard by him, and he recommended an order of completed consummation of all matters except as to fees, allowances and expenses, concerning which he would report later. No final decree was entered in the 77B proceeding, prior to filing the petition under Chapter X.

Under the plan of reorganization, Plankinton Trust, the lessor, was paid $165,655.13, plus 4% interest, on the delinquent rent account of $365,655.13. The deferred balance of $200,000 was to be paid in five years in equal quarter-year installments of $10,000 each, with interest at 5%, full payment of which had not been completed when the present proceeding under Chapter X was begun.

Of the existing bond issue of $2,077,000, the bondholders received one half the face of their original bonds in new 5% leasehold bonds, maturing January 1, 1951, and the other half in preferred stock. The fixed interest and the deferred ground rent were guaranteed by an escrow deposit of $200,000 made by A. N. Pritzker representing the Pritzker interests.

Non-par common stock was issued to the old stockholders without distinction as to their preferential positions in Properties, Inc. on the basis of 55/100 of new stock for each share of the old. The new common stock was divided into Class A and Class B, which were identical except that Class B carried the right to elect two out of five directors, while Class A had the right to elect but one director.

7889 Class B shares were given to the Pritzkers in consideration of their commitments under the plan.

986 Class B shares were given to Clara V. Harvey, wife of one of the appellants.

10,847 Class A shares were given to the Harvey family.

550 Class A shares were given to Plankinton Trust for its $100,000 of preferred stock in the old company.

Federal taxes were compromised at $25,000 and debtor was given five years in which to pay them, in equal amounts each year with six per cent interest.

A secured claim of $350,000 asserted by Albert J. Harvey was released.

Prior claims for state taxes, wages, current operating expenses and the fees and expenses of the indenture trustee were paid or compromised, and upon consummation of the plan Albert J. Harvey again became president and general manager of the reorganized company, and continued as such until the fall of 1937.

There is substantial evidence disclosing that after the consummation of the plan while Pritzker was serving as a member of debtor's board, he and Albert J. Harvey were apparently in agreement that eventually the debtor should own the entire property, including the fee, but no steps had been taken to that end. They had had disagreements over the management of the building, but none of an immediately serious nature. However, in late June of 1937, Pritzker received information, which later proved to be true, that Albert J. Harvey and his associate, Brackett, were planning to have Pritzker "thrown out of the Plankinton Building venture." Their plan to accomplish this was by means of securing purchase options to Brackett or his nominees, for the fee of the property, and also the entire Pritzker interest in the debtor. They made several attempts to secure a purchase option of the Pritzker interest. Harvey at that time told Pritzker that the building was in very poor financial condition, that " * * * everything is going very badly, and I don't see how we are going to make a go of it, and very fortunately Mr. Brackett here has offered to relieve us of our position in this building." However, when asked by Pritzker whether he was selling his interest, he declined to answer. It was later disclosed that he was one of the contemplated purchasers. Subsequently, on July 23, 1937, Pritzker executed and delivered an option to Brackett or his nominee, for his entire interest. However, it was never exercised.

In the meantime, word had come to the board of directors that Albert J. Harvey had appropriated $5000 of debtor's cash to his personal use, which he later admitted. Thereupon the two directors elected by the Pritzker stock ceased to support the Harveys, and joined with the two directors elected by the preferred stock issued to former bondholders, and removed Albert J. Harvey, as general manager, on August 3, 1937, and removed him as president at the annual meeting in December, 1937.

Prior to these actions of the Board, Albert J. Harvey had threatened Pritzker and other members of the Board with litigation, with the expressed object of creating dis-

sension and disturbance in the corporation, if they did anything to disturb his management of it.

· Soon after Harvey's removal as president and general manager, Louis Potter, formerly an attorney for debtor and the Harveys, filed suit in the State Court against debtor for attorney's fees in the sum of $125,000, and ancillary thereto instituted garnishment proceedings against the rents accruing from debtor's store tenants, the principal source of its current income. Albert J. Harvey, then a director of debtor, furnished Potter $200 in cash, out of which to defray the expenses required to institute that action.

Thereafter various members of the Harvey family instituted suits or proceedings, some against Pritzker, some against the voting trustees of debtor's preferred stock, and some against debtor's officers and directors. Some of these actions were filed in the State Court and some in the Federal Court. They charged initially that Pritzker had not fulfilled his commitments under the 77B plan, and subsequently, that Pritzker, the voting trustees and various officers and directors of debtor, and also Plankinton Trust had been guilty of fraud and conspiracy to obtain control of the debtor or its assets.

After Pritzker had terminated his association with the Harveys, he and the Plankinton Trust, in the summer of 1938, organized a corporation, Northern Realty Company. This company made the voting trustees a formal offer to purchase debtor's entire preferred stock issue for $75,000. This offer was approved by the voting trustees of the preferred stock but was not accepted by the stockholders. Northern Realty had acquired Pritzker's Class B common stock and some bonds and preferred stock of debtor. In January, 1940, Plankinton Trust bought Pritzker's stock in Northern Realty Company, later dissolving that company and acquiring ownership of the bonds and preferred stock and Class B stock of debtor originally owned by Pritzker. From that time two of debtor's directors were elected by Class B stock owned by Plankinton Trust.

On October 27, 1939, Pritzker filed a bill of peace in the district court for adjudication in one action of all Harvey litigation including the alleged claims of Pritzker's liability to the debtor, and to the Harveys under any agreement made in connection with the first reorganization. After a hearing, and a special finding of facts, that court temporarily restrained prosecution of all the pending litigation referred to above. Plankinton Trust counterclaimed against the Harveys and all other parties for a declaratory judgment to adjudicate the merits of all claims and charges in the state court actions, in the reorganization proceedings and in the Pritzker case, which the Harveys had been asserting against Plankinton Trust.

The Harveys filed an amended answer, counterclaim and cross-complaint, claiming conspiracy on the part of Pritzker and the Plankinton Trust and others, by charges embracing relationships of the parties to debtor and its predecessor over a period of years, and they asked damages in favor of the Harveys personally for $1,397,000 against the Plankinton Trust and also for attorneys' fees of $50,000. On motion, this cross-bill was dismissed as being derivative. However, the court gave the Harveys leave to amend and make it a derivative action for the benefit of the debtor, which they failed to do.

The petition in the proceeding now before us for reorganization under Chapter X was filed by the debtor on June 24, 1940. The district court, after a hearing, found that the debtor was unable to meet its maturing debts, and that all other factors required by Chapter X for reorganization were present, and on June 27, 1940, entered an order approving the petition and appointing a trustee of the debtor.

In August, 1940, Plankinton Building Properties, Inc., by Albert J. Harvey, its president and general manager, filed a petition, captioned in the 77B reorganization proceeding, and the other Harveys individually did likewise, all directed against entertaining debtor's petition under Chapter X. Motions to dismiss these petitions were presented and argued, and the court dismissed them on October 21, 1940. There was no appeal. In October, 1940, Albert J. Harvey filed a controverting answer putting in issue the merits of debtor's petition, alleging that it was not filed in good faith; that the old section 77B proceeding was still pending, and charging conspiracy by various parties including the Pritzkers and the Plankinton Trust. The other Harveys filed a similar answer. After extended hearings the court found the facts specially and rendered its conclusions of law thereon, and by order of December 2, 1940, approved debtor's petition for reorganization.

The Harveys appealed from that order to this court, and that appeal was dismissed. Further proceedings under Chapter X were temporarily delayed pending trial of the Pritzker case, as issues in those proceedings were also involved directly and collaterally in the Pritzker case. By separate stipulations of the parties made early in the Pritzker case, and in the present reorganization proceedings, it was agreed that any evidence introduced in either proceeding should be considered as evidence in the other.

An extensive trial in the Pritzker case was had before the district court in the summer of 1942. When the trial was completed and while the court was holding it under advisement, the Harveys stipulated to the entry of findings that all actions which they had brought against the various parties, referred to above, as well as their cross-complaint against Plankinton Trust, were without merit or basis in fact; and findings to that effect which provided for a permanent injunction against the Harveys instituting any further actions or otherwise making further assertion of the charges contained in those pleadings were approved by all the Harveys, both as to form and substance. Those findings were entered by the trial court, and thereafter judgment was entered accordingly, which in accordance with the stipulation also assessed $2,500 damages to Pritzker against the Harveys.

The stipulation also provided for dismissal of Albert J. Harvey's claim of $25,000 against the debtor, and for allowance of the claims of Plankinton Trust as owner of bonds, income notes and preferred and common stock of debtor. As to that portion of the Plankinton Trust claim, based on income notes to debtor, the stipulation provided for allowance of the claim with all accrued interest at the rate of 6%, and judgment was entered accordingly.

The stipulation just referred to also provided that the 77B proceeding had ended and there was no reason for keeping it open, and that a final closing decree be entered. By the same stipulation the Harveys waived all right of appeal from the judgment to be entered in the Pritzker case.

On May 26, 1943, the district court made an order of insolvency in the reorganization proceedings, finding the debtor to be insolvent as of January 31, 1943, after bringing current to that date its valuation

of the productive assets as determined by its order of January 15, 1941. In its orders of approval and consummation of the plan entered January 21 and 31, 1944, the court found the debtor to be insolvent, using the reorganization trustee's most recent balance sheet of December 31, 1943.

An extended hearing on the value of debtor's leasehold estate and operating assets, referred to by the parties as debtor's productive assets, was held before the court in the summer of 1941, in which were presented the appraisal and also the testimony of two independent appraisers whom the court had appointed on motion of the Reorganization Trustee, and the testimony of an auditor and also of a valuation analyst of the Securities Exchange Commission. Expert witnesses were also called by the bondholders' committee and by the Harveys and by the representative of the preferred stock appointed by the court. Several hearings were had with respect to the valuation of productive assets, and with respect to debtor's liabilities, and on September 11, 1941, the court fixed the value of those assets at $1,550,000. On October 13, 1941, the court on its own motion vacated this order, and on December 15, 1941, made a more detailed finding as to the valuation and again fixed the full value at the same figure.

The court's initial valuation of the productive assets was based on a 25-year economic life of the debtor's leasehold estate. In bringing that valuation of leasehold current to subsequent dates, the court deducted from that valuation amounts proportionate to the used economic life represented by the elapsed time since the initial valuation. The asset and liability statements used at the time the leasehold value was brought current reflected the effect of the income realized by the debtor's trustee in the elapsed time since the initial valuation, no reserve account having been carried by the trustee for depreciation.

As the elapsed time from the initial valuation of the leasehold fell in the war period, required maintenance of debtor's building could not be made by the trustee because of wartime regulations, and the trustee set up no reserve for such maintenance on his books or balance sheets. In bringing the initial valuation current, the court deducted an amount for that purpose which it determined to be conservative. The depreciation as fixed by the court as of January 31, 1943, was $93,633.33, and as of

December 31, 1943, it was $151,000. The court fixed the deferred maintenance at $39,699.89 as of January 31, 1943, and $54,733.98 as of December 31, 1943.

In May, 1943, the court found debtor's liabilities to be $1,507,255 as of January 31, 1943, which date was agreed upon as an appropriate one by all parties, and the amount so fixed did not include reorganization expenses. In approving and confirming the present plan in January, 1944, and in determining debtor to be insolvent as of December 31, 1943, the balance sheet used showed total assets of $1,535,562.69, and total liabilities of $1,563,213.56 without including reorganization expenses. The expenses at that time were estimated to be $25,200. The reorganization expenses as determined by the court on April 5, 1944, amounted to $85,372.23. No fees or expenses were ever asked or received by Plankinton Trust.

The plan as finally approved on January 21, 1944, provided for payment of the full par amount, plus accrued interest to date of consummation, at the accelerated rate, on all debtor's outstanding bonds, except only the bonds owned by Plankinton Trust, and provided for payment in full of the principal of all unsecured debts of the debtor, without interest. Based on a finding of insolvency, the district court ruled that stockholders were not affected and their acceptance of the plan was not required. It further ruled that as all bonds, except those of Plankinton Trust, were being paid in full, the bondholders were not affected by nor required to accept the plan; that the only class to vote on the plan was that of the unsecured claimants as they were not being paid interest on their claims, and they were permitted ratably to subscribe to the required new capital. This plan was submitted to the unsecured claimants, and 93.2% of them accepted it. On January 31, 1944, the court confirmed this plan of reorganization and directed its consummation.

The alleged errors relied on arise out of the court's rulings that it had jurisdiction of the debtor; that the debtor was insolvent; that the proceedings and the plan were fair and equitable; and that they met the requirements of Chapter X of the Bankruptcy Act.

Appellants first contend that the court was without jurisdiction to entertain debtor's petition when it was first filed, because the proceeding under Section 77B, in respect to the same subject matter, was still pending, and the court then found as a jurisdictional fact that no such proceeding was pending.

The court actually found that there was no other proceeding pending in which the interests of creditors and stockholders would be subserved better than they would be in the proceeding under Chapter X. That the final entry of discharge had not been entered when debtor filed its petition under Chapter X is not denied and this record discloses no reason, except inadvertence, for failing to enter that final decree. It was due before the debtor filed its petition under Chapter X. The question was raised the first time by the Harveys on August 20, 1940, when they filed their petitions captioned under the 77B proceeding. All the Harveys entered their appearances to debtor's petition under Chapter X and filed their answers on October 8 and 15, 1940. The court dismissed their petitions to reopen the 77B proceeding on October 21, 1940. There was no appeal from that order, and the court again approved debtor's petition for reorganization on December 2, 1940. From this last order the Harveys appealed, and that appeal was later dismissed.

Subsequently, on July 23, 1942, all the parties to the Pritzker case stipulated that the proceedings for reorganization of Plankinton Building Properties, Inc., under Section 77B had been completed, and there was no reason for keeping those proceedings open; that the entry of a final decree approving the report of the master dated July 24, 1936, on the consummation of the amended plan of reorganization dated March 31, 1936, discharging the debtor from its debts and liabilities, terminating all rights of stockholders excepting as provided in the amended plan, and finally closing the case, was approved by the parties. It was further stipulated that all parties waived any and all rights to appeal from any findings, conclusions, order, judgment or decree theretofore made in the Pritzker case, or which was approved or contemplated by the stipulation.

On the same day the court rendered judgment in the Pritzker bill of peace proceedings, based on the stipulation, that the claims and charges of wrongful acts in the purported petition of Plankinton Properties, Inc., verified by Albert J. Harvey, Sr., under date of August 16, 1940, and the petition of the other Harveys under date of

August 15, 1940, all in the reorganization proceedings under Section 77B, were insufficient to warrant recovery or relief against any one or all of the parties, and were non-meritorious and without basis in fact. The court thereupon permanently enjoined the Harveys from instituting further actions in relation to, or making further assertion of, the charges contained in these pleadings. Subsequently the Harveys presented for consideration a plan of reorganization in this proceeding under Chapter X, but this was not approved.

Under these circumstances we think the court had jurisdiction of the proceeding under Chapter X.

It is next contended by appellants that the court erred in holding that the debtor was unable to meet its maturing debts, and that it was insolvent. These are questions of fact. That debtor was unable to meet its maturing debts was established by substantial evidence, and that ultimate fact was strongly supported by the testimony of Albert J. Harvey, Sr., when he said as early as July 9, 1937, that the building was in very poor financial condition; that everything was going very badly, and he did not see how they were going to make a go of it.

The main question with respect to this contention, however, arises over the valuation of the debtor's property, more especially the leasehold. Appellants insist that the valuation found by the court was much too low. However, the witnesses upon whom the court relied as to this phase of the case, and to whom we have hereinbefore referred, must be considered by this court, under the evidence, as reputable men experienced in appraisals of such property. Most of them valued the property at a considerably less figure than did the court. Their evidence was substantial and we cannot disturb the court's valuation.

We arrive at the same conclusion as to the court's finding with respect to the unproductive assets and the debtor's liabilities. We have heretofore set forth the method by which the court arrived at its conclusions, and unless that method is unsound the court's computation and determination of insolvency must be approved.

In this respect it is first contended that the court erred in using as a base its earlier valuation of December 15, 1941, and deducting therefrom certain items such as interest, consumed economic life of the asset, depreciation, court costs and expenses, a part or all of which were not included in the court's earlier valuation. In other words the court merely made its earlier valuation current. These deductions are reflected in the court's final valuation of the productive assets. Furthermore, the Harveys appealed to this court from the district court's order fixing the initial valuation. That appeal was dismissed and these appellants are now precluded from contesting that valuation. In re Trust #2988 of Foreman Trust & Savings Bank, 7 Cir., 85 F.2d 942; In re Irving-Austin Building Corporation, 7 Cir., 96 F.2d 905; In re Louis Joliet Garage Corporation, 7 Cir., 100 F.2d 751. Moreover, there is substantial evidence in this record that rehabilitation needs of the property amounted to more than $400,000. The court did not specify the amount it thought necessary for this purpose. It said: "I am also convinced that a considerable number of the items in the rehabilitation program * * * are not necessary * * * at this time. Taking all these matters into consideration, I have reached the conclusion that a proper valuation of the assets of the debtor is $1,550,000." If the court had entirely disregarded such item, and it is clear that it did not, its valuation of the property would exceed that of reputable expert witnesses by $200,000.

It is urged by appellants that the rate of earnings increased from the date of the initial valuation. The court found this to be true. However, this increase was due to the leasing of a large amount of office space to war agencies, cancellable at any time on thirty days notice, and to the increase from percentage rentals of the store leases resulting from increased retail merchandise sales during the war period. The court was of the opinion that war earnings cannot form a sound basis upon which to forecast the value of an enterprise. That ruling was correct. See Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959. We think the valuations were correctly computed, and that the conclusion of insolvency was proper.

Appellants contend that the proceedings under Chapter X were inequitable and contrary to the intendment of that statute, in that they were so influenced by the actions of the landlord as to violate

126

the equitable principle that the landlord shall do nothing in derogation of the lessee's estate. Of course, that principle applies to the lessee as well as to the landlord, and the question here is whether Plankinton Trust, the landlord, which was also a stockholder and creditor of lessee, the debtor, was precluded, as such creditor and stockholder, from participating in the plan of the debtor's reorganization, at least to the extent of disturbing the debtor's quiet enjoyment of the premises. It is clear that the covenant of quiet enjoyment of debtor has not been breached. True, its enjoyment of the premises has not always been so serene as any tenant might desire, as indicated by the content of this enormous record. However, that lack of quiet enjoyment was caused by debtor's financial inability to meet its obligations under the contract by which it had any right to hold possession. If Plankinton Trust as a creditor and stockholder of debtor is precluded from participating in the reorganization, merely because it is the debtor's landlord, that principle must arise from the contract by construction or implication. Section 235.50 of the Wisconsin Statutes defines a lease for more than three years as a conveyance, and Section 235.02 provides that no covenant shall be implied in a conveyance. The Wisconsin court has held that in a lease for more than three years a covenant cannot be raised by construction or implication. Goldman v. Dieves, 159 Wis. 47, 149 N.W. 713. We think there is no merit in this contention.

■ Appellants further contend that the court erred in holding that the deferred interest coupons on debtor's bonds were then due rather than discounting them, because they were payable in 1951, when the bonds were due. These coupons were by their terms payable at the bond maturity. However, the indenture authorized acceleration by the trustee for nonpayment of current interest, which made the accrued but deferred interest coupons then due. This court has held under a similar situation that a bondholder has a contract right of acceleration. In re Utilities Power and Light Co., 7 Cir., 91 F.2d 598. Moreover, in appeals Nos. 8422 and 8423, those appellants by their attorneys stipulated that "For the purposes of these appeals, it shall be deemed that the principal of the Leasehold Bonds became due and payable as a result of such acceleration on November 19, 1943." Furthermore, the Harveys appealed

to this court from the court's order vacating the injunction against acceleration of debtor's bonds, and that appeal was dismissed on February 27, 1943. In re Plankinton Building Company, 7 Cir., 133 F.2d. 900.

■ Appellants further contend that the court erred in holding that the accrued interest on debtor's income notes was not to be discounted. This contention is based on the theory that inasmuch as such interest was not due until 1956, it must be reduced by discounting it as though not payable until 1956. However, appellants are precluded from asserting this contention, for on July 23, 1942, they stipulated for entry of an order, which was entered, allowing the claims on such notes with accrued interest at six per cent. Moreover, the plan of reorganization under the 77B proceeding, under which such notes were issued, called for the application of the debtor's earnings in stated order of priority, and required that when prior applications had been made, all remaining annual earnings were to be applied in payment of accrued interest and principal of such income notes. This constituted a contractual relationship which contemplated and required such application of the earnings and of course the continued operation of debtor's business. That relationship was breached by debtor's voluntary petition for reorganization which resulted in stopping the application of earnings as provided in the 77B plan. Hence, such unpaid noteholders were entitled to have their claims allowed on the basis of including unpaid accrued interest without discount. See Central Trust Co. v. Chicago Auditorium, 240 U.S. 581, 36 S.Ct. 412, 60 L.Ed. 811, L.R.A.1917B, 580; Kamps & Sacksteder Drug Co. v. United Drug Co., 164 Wis. 412, 160 N.W. 271.

■ Appellants further contend that this plan of reorganization was a plan to liquidate the debtor rather than to reorganize it, which, of course, will not be permitted under Fidelity Assurance Ass'n v. Sims, 318 U.S. 608, 63 S.Ct. 807, 87 L.Ed. 1032, and Hoile v. Unity Life Ins. Co., 4 Cir., 136 F.2d 133. A reading of this record convinces us that this is not true. The court found to the contrary and that finding is substantially supported by the evidence.

Much time was consumed in the trial of these issues. Many special findings of fact

and conclusions of law were made at different times, and they were always accompanied by written opinions. We think all the findings of fact thus made are supported by substantial evidence, and the conclusions of law based thereon are sound.

The orders appealed from are Affirmed.